In re Tammy Ann **MIKOLOWSKI**, Debtor.

**First USA Bank, N.A., Plaintiff,**

v.

**Tammy Ann Mikolowski, Defendant.**

Bankruptcy No. 00–46089–R.
Adversary No. 00–4544.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

March 2, 2001.

Elizabeth M. Abood, Rochester Hills, MI, Karen L. Rowse–Oberle, St. Clair Shores, MI, for creditor.

Robert W. Lee, Harrison Township, MI, for debtor.

*Opinion*

STEVEN W. RHODES, Chief Judge.

In this adversary proceeding, First USA Bank seeks a judgment that the debt owed

to it by Tammy Ann Mikolowski, the debtor, is nondischargeable for fraud under 11 U.S.C. § 523(a)(2)(A). Following trial, the Court took the matter under advisement. The Court now concludes that First USA Bank failed to establish by a preponderance of the evidence that the debtor intended not to repay the debt when she incurred it. As this is a crucial element of First USA's fraud claim, the complaint must be dismissed.

## I.

Mikolowski lost her employment in May, 1998. While she sought new employment, Mikolowski collected unemployment benefits. However, the benefits ceased in September, 1998. During that time period, Mikolowski entered a program and became a certified medical assistant. Michigan Works paid the cost of the program but did not pay her living expenses. Mikolowski testified that she used credit cards to pay her living expenses during that time period. Mikolowski stated that for the two year period of time before she filed her bankruptcy petition, her expenses had exceeded her income. Further, she testified that she had to rob "Peter to pay Paul," using convenience checks issued by one credit card issuer to make the minimum payment on another credit card.

On April 19, 2000, Mikolowski filed a chapter 7 bankruptcy petition. Her petition discloses $36,400 in unsecured debt, primarily credit card debt. At the time she filed her petition, Mikolowski owed $5,141.31 in unsecured credit card debt to First USA Bank. First USA filed an adversary proceeding seeking a judgment that the amount owed to it is nondischargeable under § 523. First USA asserts that Mikolowski obtained the debt through fraud or false pretense because she had no intention to repay the debt at the time it was obtained. Mikolowski con-

tends that she fully intended to repay debt and thus she denies any fraud.

## II.

11 U.S.C. § 523 addresses the dischargeability of a debt when a creditor alleges fraud, false pretenses or false representation:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

The creditor has the burden of proving by a preponderance of the evidence that a debt is nondischargeable under § 523(a)(2)(A). *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

In *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir.1998), the court of appeals clarified that under § 523(a)(2), the creditor must prove the following elements:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Id.*, 141 F.3d at 280–81 (footnote omitted) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir.1993)).

In *Providian Bancorp v. Shartz (In re Shartz)*, 221 B.R. 397 (6th Cir. BAP 1998), the Sixth Circuit Bankruptcy Appellate Panel addressed the state of the law regarding dischargeability under § 523 in the Sixth Circuit after *Rembert*.

The Sixth Circuit recently clarified that "[t]he use of a credit card represents either an actual or implied intent to repay the debt incurred." *Rembert*, 141 F.3d at 281. However, the court noted that use of a credit card does not imply that the user has the present ability to repay the debt. *Id.* Rather, the court held that fraudulent intent must be determined from the totality of the circumstances and should not be implied solely based on use of a credit card when there is no immediate ability to repay. *Id.* at 281–82.

In *Rembert*, the debtor used cash advances on her credit card to fund gambling trips. After incurring gambling losses of between $18,000 and $24,000, the debtor obtained a second mortgage on her home to pay her credit card debts, but continued to obtain cash advances to gamble. At trial, the debtor "testified that at the time she was obtaining cash advances for gambling, she believed that she would be able to win enough money to repay card debts, but continued to obtain cash advances to gamble." At trial, the debtor "testified that at the time she was obtaining cash advances for gambling, she believed that she would be able to win enough money to repay her credit card debts." *Id.* at 279. The bankruptcy court found that the debtor intended to defraud the credit card issuers because the debtor had reason to know she would not be able to repay the debt. The district court reversed and the Sixth Circuit affirmed the reversal, holding "that the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." *Id.* at 281. Fraudulent intent cannot be implied simply based on an inability to repay the debt. *Id.* The Sixth Circuit noted that "there was no evidence presented to the bankruptcy court indicating that Rembert used the credit cards without intending to repay the [credit card issuer]." *Id.* Given the debtor's testimony regarding her belief that she would win enough to repay the debt and the fact that she took a second mortgage in an attempt to repay the debt, the court determined that the debtor subjectively intended to repay the debt. *Id.* at 282–83.

*Shartz*, 221 B.R. at 399–400. *Shartz* went on to compare the facts of the case to other recent cases:

These facts are similar to the facts of *Huntington National Bank v. Lippert (In re Lippert)*, 206 B.R. 136 (Bankr. N.D.Ohio 1997). In *Lippert*, the debtor used advances from credit cards to pay balances in full on other cards. The debtor also used his credit cards to pay for his wedding while he was insolvent. Although the debtor had been unemployed for nine months, he was diligently searching for a new job. The court held that the debtor's actions simply indicated an attempt "to tide [himself] over during a difficult time" and not "a final splurge prior to writing off his debt in bankruptcy." *Id.* at 141.

This case is unlike *American Express Travel Related Services Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122 (9th Cir.1996) and *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996). In *Eashai*, the debtor used 26 credit cards to maintain minimum payments, and ran up debt of over $100,000 after he became unemployed. Part of the debt included a gambling spree and a trip to Pakistan.

*Eashai,* 87 F.3d at 1085–86. In *Hashemi,* the debtor financed a six-week trip to Europe at a cost of more than $60,000, even though he already owed over $300,000 in credit card debt. Upon returning home, the debtor filed for bankruptcy. *Hashemi,* 104 F.3d at 1124. The court determined that the debtor had attempted to have "a last hurrah" at the creditor's expense. *Id.* at 1126. In both of these cases, the debt was determined to be nondischargeable.

In this case, Shartz testified to an intent to repay her debt when she became employed. During the time that she used her credit cards to maintain balances on other cards and to pay daily living costs, she was actively seeking employment. Part of the debt incurred was an investment in a home business. The bankruptcy court stated, "Of further significance is the undisputed fact that there has been no showing the Debtor purchased any luxury goods or services with the charges or advances made during the subject period." *Shartz,* at 401. The totality of the circumstances indicates that Shartz was attempting to tide herself over during difficult times, rather than to have "one last hurrah" at the expense of her creditors. The bankruptcy court found that Providian failed to prove by a preponderance of the evidence that Shartz did not intend to repay the debt. Based upon the entire record, the Panel is not left with a definite and firm conviction that a mistake has been committed. *Shartz,* 221 B.R. at 400–01.

### III.

In the present case, over the course of two years, during a time of unemployment, job training and beginning a new job, Mikolowski used seven credit cards to maintain her living expenses, incurring a total credit card debt of $36,400.

Regarding the specific debt to First USA, between September of 1999, when the account was opened, and April of 2000, when she filed for bankruptcy relief, she incurred $5,141.31 in credit card debt. Her income in 1998 was $16,900. In 1999, she earned $21,400 and in 2000, her income was $23,300. She is single and has no dependents. When she incurred the debt to First USA, and at the time of her bankruptcy, her expenses exceeded her income by $200 per month. She did make the minimum payments on the First USA account until February of 2000, when she stopped using the card. Her charges were within the $5,000 limit on the card, but the limit was exceeded just before bankruptcy through interest and other charges.

*Rembert* and *Shartz* hold that a debtor's inability to pay the debt, by itself, is not enough to prove fraud or intent not to pay. Rather, the debtor's intent must be determined from the totality of the circumstances. Recognizing this, First USA asserts that other circumstances justify the inference that Mikolowski intended not to repay the debt. For example, it asserts that Mikolowski made "luxury" purchases including sending flowers from a florist, purchasing cigarettes for herself and as gifts for her family, and purchasing a new television when her old one still functioned. However, even if these items were "luxury" purchases, they were insignificant in relation to her total usage of the credit card. These purchases certainly do not rise to a level comparable to "the last hurrahs" described in *Hashemi* and *Eashai.*

More significantly, First USA asserts that the debtor's actions in transferring balances from one account to another and in using the proceeds of one card to make payments on another constitute credit card kiting and demonstrate an intent not to

repay the debt. Mikolowski testified that she intended to pay back the credit card debts and only moved the debt from one card to another in an attempt to take advantage of lower interest charges. When asked how she intended to pay back the debt, she said, "By working every day, and trying to get a better job ... with more pay ... [and] better hours, so I could get a second job." (Tr. February 6, 2001, Trial at 37.)

Ultimately, the issue turns upon the Court's determination of the credibility of the debtor's testimony. In this case, having observed and evaluated the debtor's testimony, the Court finds that the debtor's testimony that she did intend to repay First USA is credible. Moreover, as in *Shartz*, "The totality of the circumstances indicates that [Mikolowski] was attempting to tide herself over during difficult times, rather than to have 'one last hurrah' at the expense of her creditors." *Shartz*, 221 B.R. at 401. The Court finds that First USA did not prove by a preponderance of the evidence that Mikolowski did not intend to repay her credit card debt.

Accordingly, the Court holds that the debt is dischargeable and that the complaint should be dismissed. An appropriate order will be entered.